**In re INDEPENDENT SCHOOL DISTRICT NO. 318 HEARING Regarding Unrequested Leave of Absence and Seniority Issues Associated Therewith.**

No. C1–88–1529.

Court of Appeals of Minnesota.

Jan. 24, 1989.

William F. Garber, Peterson, Engberg & Peterson, Minneapolis, for relator.

Paul F. Wojciak, Respondent School Dist. Atty., Hibbing, for Independent School Dist. No. 318.

Heard, considered, and decided by RANDALL, P.J., and FOLEY and SCHUMACHER, JJ.

## OPINION

RANDALL, Judge.

This is an appeal on a writ of certiorari from the decision of a school board to place relator on unrequested leave of absence. We affirm.

## FACTS

Relator, Gladys Brown, was a full time elementary education teacher during the 1987–88 school year. At the end of this

school year, she was placed on unrequested leave of absence (ULA) by respondent school board of Independent School District No. 318 (District). Respondent had proposed to place petitioner and 27 other teachers on ULA because of a substantial deficit in the district's general fund. Along with the teacher layoffs, the school administration had proposed budget reductions of approximately 1.5 million dollars.

After relator was proposed for ULA, she requested a teacher hearing. This hearing took place before hearing officer John Cope on April 25, 1988. On May 23, Cope ruled that relator should not have been placed on ULA because certain less senior or probationary teachers had been retained in positions for which relator was qualified. Even though relator was recalled to a morning half-time position for the 1988–89 school year, Cope ruled that relator had the right, pursuant to a Teacher Agreement, to "bump" other less senior and probationary teachers who were also assigned to morning half-time positions, despite the fact that relator could not simultaneously teach two morning positions. The effect of the examiner's order would require the District to create a half-time afternoon position so that relator could continue her half-time morning position and take on a new afternoon half-time position in order to have a full-time position.

The half-time position to which relator was recalled, and the half-time afternoon position which she wants the District to create, are both Title I teaching positions. Title I is a federally-funded program designed to provide remedial tutoring for elementary school students in the areas of reading and math. Since 1982, these positions were provided only on a half-time basis, in the morning, so as to correspond with the regularly scheduled teaching of reading and math. Robert Pecha, district administrator of Title I, testified at the April 25 hearing that Title I subjects are better taught in the morning since young students are then fresher and better able to assimilate reading and math. He stated

there are sound educational reasons why Title I reading and math are structured in the morning while other classes such as physical education, music and art can properly be taught in the morning or afternoon. In 1985, District 318 was given a national award for running a successful model Title I program, based in part on the fact that it was a morning program. A parent advisory committee also recommended that Title I be taught on a half-time basis in the morning only.

Relator is licensed to teach Title I, and, in fact, did teach Title I prior to the 1981–82 school year when those positions became half-time. When these positions became all half-time, Brown became a full time elementary education teacher.

Based upon the testimony at the hearing, Cope accepted the District's position that the Title I students' interests are best served by being taught in the morning only. Nevertheless, he concluded, as a matter of law, that relator had a right to require the District to create an afternoon Title I position so that relator could bump any of the four less senior or probationary teachers who could, theoretically, be assigned to that afternoon program so that relator would now have both a morning and an afternoon Title I shift.[1] However, the school board did not accept the examiner's recommendation and found that keeping the Title I program mornings only was in the best interests of the student, and concluded that a "sufficient basis for the placement of teacher on [ULA] existed." The school board refused relator's request that an afternoon Title I position be created to accommodate her desire to teach both a morning and an afternoon Title I program. Relator filed a petition for writ of certiorari to this court on July 19, 1988, to review the action of respondent school board. We affirm.

## ISSUES

Was the school board's decision to place relator on unrequested leave of absence based on an erroneous theory of law?

---

1. The hearing officer based this decision upon this court's statement in *Westgard v. Independent School District No. 745,* 400 N.W.2d 341, 345 (Minn.Ct.App.1987), that bumping rights are absolute and allow no discretion to school board.

## ANALYSIS

The standard of review applicable to decisions of a school board is whether the determination of the board is fraudulent, arbitrary, unreasonable, or not supported by substantial evidence on the record, not within its jurisdiction, or based on an erroneous theory of the law. *Foesche v. Independent School District No. 646*, 300 Minn. 478, 485, 223 N.W.2d 371, 375 (1974).

Relator argues that her contract gives her the right to "bump" any teacher, currently less senior, teaching Title I in the school district. She claims this is an existing contract right negotiated pursuant to Minn.Stat. § 125.12, subd. 6a (1986), which provides that:

> The school board and the exclusive bargaining representative of the teachers *may negotiate a plan providing for unrequested leave of absence* without pay or fringe benefits for as many teachers as may be necessary because of discontinuance of position, lack of pupils, financial limitations, or merger of classes caused by consolidation of districts. Failing to successfully negotiate such a plan, the provisions of subdivision 6b shall apply.

(emphasis added). The plan negotiated between relator's bargaining representative and the respondent school district states:

> No teacher who has acquired *continuing contract rights* shall be placed on unrequested leave while probationary teachers are retained for positions for which the teacher who has acquired continuing contract rights is qualified.

Teachers Agreement, 1985–87, Section 8, subd. 3 C(1) (hereinafter Agreement) (emphasis added).

The contract also provides that:

> No teacher shall be placed on unrequested leave of absence while less senior teachers are retained in positions for which the more senior teacher is qualified.

Agreement, Section 8, subd. 3 C(2). "Qualified" means a teacher in the bargaining unit who presently holds a valid state license. Agreement, Section 8, subd. 2 B.

Relator is "qualified" to teach Title I. Moreover, she has "continuing contract rights," as she was retained after she completed her probation. *See* Minn.Stat. § 125.12, subd. 4. Therefore, the issue is, does relator have the right under contract to "bump" a less senior or probational half-time teacher so as to restore herself to full time teaching status despite the fact that the "position" into which she seeks to bump does not exist?

In *Beste v. Independent School District No. 697*, 398 N.W.2d 58, 61 (Minn.Ct.App. 1986), this court held that under Minn.Stat. § 125.12, subd. 6b, teachers have the right to "bump," or take the job of, a less senior teacher whenever a school district proposes such a teacher for unrequested leave of absence, provided that the senior teacher is appropriately licensed.[2] Minn.Stat. § 125.12, subd. 6b, provides:

> (a) The board may place probationary teachers on unrequested leave first *in the inverse order of their employment.* No teacher who has acquired continuing contract rights shall be placed on unrequested leave of absence while probationary teachers are retained in positions for which the teacher who has acquired continuing contract rights is licensed;
>
> (b) Teachers who have acquired continuing contract rights shall be placed on unrequested leave of absence in fields in which they are licensed *in the inverse order in which they were employed* by the school district. In the case of equal seniority, the order in which teachers who have acquired continuing contract rights shall be placed on unrequested leave of absence in the fields in which they are licensed shall be negotiable;

(emphasis added). If bumping rights derive from the language "in the inverse order of employment," then they should also derive from the contract language here of "no teacher shall be placed on [ULA] while probationary [or "less senior"] teachers are retained." Even if the contract were silent

---

2. *Beste* dealt with statutory bumping rights under Minn.Stat. § 125.12, subd. 6b, not negotiated *contract* rights under subd. 6a at issue in this case.

on bumping rights, relator still possesses the statutory right to bump under subdivision 6b. *See Atwood v. Independent School District No. 51*, 354 N.W.2d 9, 12 (Minn.1984) (holding "the presence of a plan negotiated under Minn.Stat. § 125.12, subd. 6a (1982), does not abrogate or eliminate any other statutory rights under section 125.12."); *Ruter v. Independent School District No. 347*, 364 N.W.2d 823, 826, n. 2 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn.1985), (contract plan may be read to incorporate statutory bumping rights). Thus we agree with relator that her contract accords her the legal right to bump. However, we find no authority to support the position that, against the best interests of students, a new position has to be *created* for her. The facts before us simply do not present a classical "bumping" situation.

Before a senior teacher proposed for ULA may exercise his statutory or contract bumping rights, he first must be able to point to an *existing* position in the curriculum currently occupied by a probationary or less senior teacher that he is licensed or qualified to fill. *Cf. Hendrickson v. Independent School District No. 319*, 303 Minn. 423, 425–26, 228 N.W.2d 126, 128 (1975) (defining "position" in Minn.Stat. § 125.12, subd. 6b(e), as "that of a teacher at the level and *in the curricula* for which he was certified * * * ") (emphasis added). Here, relator seeks not to "bump" into an existing position in the curriculum, rather, she seeks to have the school board create one. No Title I position taught in the afternoon currently exists in any of the district's schools. This fact is not in dispute. We do not find that, under either relator's teachers' contract or Minn.Stat. § 125.12, subd. 6b, the school district is compelled to create a position adverse to the best interests of students.

The policy basis for according discretion to school boards is premised not on the fact that school board discretion is an end unto itself, but rather that this discretion be exercised so as to advance and protect the educational interests of school children. *See Strand v. Special School District No. 1*, 392 N.W.2d 881, 885 (Minn.1986) (holding that in realignment situations, "the school district's needs reflecting the welfare of the students and public" must be considered); *Westgard v. Independent School District No. 745*, 400 N.W.2d 341, 345 (Minn.Ct.App.1987).[3]

Here, Robert Pecha testified that Title I is better taught in the morning since the students, who also receive reading and math training then, are fresher and more receptive to reading, math instruction, and tutoring early in the day. The parents' advisory committee recommended that Title I subjects continue to be taught in the morning. Part of Pecha's testimony consisted of hearsay statements about what other educators, educational consultants, and members of the parents' advisory committee thought. However, at oral argument, relator's attorney, with appropriate candor, agreed that the hearing examiner had the authority to consider hearsay testimony, and agreed that the examiner had properly accepted this part of Pecha's testimony. Further, relator's attorney acknowledged that he presented no direct evidence in dispute of Pecha's contention that Title I programs are better taught in the morning. Relator's attorney did vigorously cross examine Pecha, attempting to point out that if music and art can equally be taught in the morning and afternoon, so

---

3. Cases in other jurisdictions interpreting similar teacher tenure statutes are in accord with this position. For example, *Johnson v. United School District Joint School Board*, 201 Pa.Super. 375, 378–79, 191 A.2d 897, 900 (1963) held that:

> The fundamental public policy, expressed in the [state] Constitution and underlying school laws, is to obtain a better education for the children of the Commonwealth. It was the intention of the legislature to subordinate all other considerations to this policy. The

teacher tenure provisions must be considered in the light of this fundamental public policy. (citations omitted)

*See also* E. Bolmeier, *Teachers' Rights and Liabilities* § 9.1 (1971) ("courts tend to define the legal limits of teachers' rights and liabilities in accordance with the effects they would have upon the public. Since schools exist primarily for the benefit of the pupils, the judicial view is that teacher welfare is subordinate to pupil welfare").

should reading and math. However, from the evidence presented, the examiner specifically found that limiting Title I to morning programs was in the best interest of the children. We note that the District's national award for operating a "model" Title I program was based, in part, on the fact that Title I was taught only in the morning. Thus, substantial evidence, uncontradicted, exists in the record, justifying both the hearing examiner's and the school board's finding that it is in the best interests of the students that Title I subjects be taught only in the morning. Even accepting relator's argument that this is a "bump" situation, she has not cited, nor does our research reveal, any case law demonstrating that, in the face of clear evidence of educational harm, teachers' seniority or contract rights must be preserved at all costs.

Part of the dispute between the parties is relator's position that this is a bump situation, and respondent's position that it is realignment. Even assuming the stronger position for relator, a bump situation, we do not find a right to bump into a non-existent position, nor to have a new position created to the detriment of the students. This court will not create for relator a new remedy under Minn.Stat. § 125.12 and disrupt a carefully delineated legislative scheme which balances the rights of teachers to retain their positions against the rights of school districts to make staff reductions which best protect the interests of students. *See Strand*, 392 N.W.2d at 885.

### DECISION

The school board did not err in determining that relator did not have the right to require the school board to create a new position detrimental to the best interests of the students so that she would have access to two separate half-time positions.

AFFIRMED.

FOLEY, Judge (dissenting).

I respectfully dissent. The majority opinion states the pivotal issue to be that relator seeks to "bump" other teachers for a non-existent position. I disagree. It is my view that the issue is whether the school district should rearrange and realign its schedule and teachers to accommodate, if reasonable and practical, the senior contract rights of Brown. *See Strand v. Special School District No. 1*, 392 N.W.2d 881 (Minn.1986). In *Strand*, the supreme court held that

where reassignment or realignment and reassignment is practical and reasonable, a school district is required to reassign teaching duties in a manner designed to continue the employment of senior teachers and that because reassignment was both practical and reasonable in this case, termination of Strand's services for discontinuance of position was violative of her rights under the Teacher Tenure Act.

*Id.* at 886.

Brown is a continuing contract teacher and is licensed to teach Title I. At present, two half-time Title I positions exist at the school where Brown teaches. Both classes are taught in the morning. The teacher in the other position, Carol Hanson, is less senior to Brown. It was conceded at oral argument by the District's counsel that one of the courses could be moved to the afternoon. If this were done, Brown would then be able to teach both morning and afternoon, thus protecting her full contract rights. If the holding of *Strand* is to be given its full meaning that every effort be made to accommodate the contract rights of the tenured teacher, where reasonable and practical, then this is such a case.

It is clear from the testimony of the principal and Title I director, Robert Pecha, that scheduling the Title I courses only in the morning is a preference, but is not essential for the health and well-being of the pupils. The testimony of the principal is enlightening. He agreed that it was possible to schedule Title I in the afternoon, but that he preferred not to do so.

Q. * * * Is it possible to switch reading and math to the afternoon?

\* \* \* \* \* \*

A. I would say that it would be possible, but again, if I would be allowed to express my preference—

\* \* \* \* \* \*

Q. * * * What is it about teaching reading or math in the morning that's better than teaching it in the afternoon?

A. I would answer that it is my belief * * * that I think during the course of the day I think there are some times during the day that people would be more able and it would be a better environment. * * *

Q. That's your personal opinion?

A. That is again an opinion that I would say * * * is based upon experience * * *.

Even if it could be soundly argued that the school district has discretion in the areas of scheduling and realignment of teachers, if moving one Title I course to the afternoon has no adverse effect on the students, then that course of action should be taken to protect the contract rights of Brown. There is not a scintilla of evidence in this record to reflect any adverse effect on the students if one Title I course were moved to the afternoon. Unless rescheduling occurs, less senior and probationary teachers will be given more recognition than either the statute or case law permits and thus elevated to a superior position over Brown, a senior tenured teacher, whose rights it is the duty of the district to protect.